Mr. Chief Justice Marshall
delivered the opinion of the Court, and, after stating the case, proceeded as follows:
The appellant contends that this decree is erroneous, because the laws which purport to give the exclusive privilege it sustains, are repugnant to the constitution and laws of the United States.
They are said to be repugnant-
1st. To that clause in the constitution which authorizes Congress to regulate commerce.
2d. To that which authorizes Congress to promote the progress of science and useful arts.
The State of New-York maintains the constitutionality of these laws; and their Legislature, their Council of Revision, and their Judges, have repeatedly concurred in this opinion. It is supported by great names-by names which have all the titles to consideration that virtue, intelligence, and office, can bestow. No. tribunal can approach the decision of this question, without feeling a just and real, respect for that opinion which is sustained by such authority; but it is the province of this-Court, while it respects, not to bow to it implicitly; and the Judges must exercise, in the examination of the subject, that understanding which Providence has bestowed upon them, with that independence which the people of the United *187 States expect from this department of the government.
PrinciP1f.’of
As preliminary to the very able discussions of the constitution, which we have heard from the bar, and as having some influence on its construetion, reference has been made to the political situation of these States, anterior to its formation. It has been said, that they were sovereign, were completely independent, and were connected with ehch other only by a league. This is true. But, when these allied sovereigns converted their league into a government, when they converted their Congress of Ambassadors, deputed to deliberate on their common concerns, and to recommend measures of general utility, into a Legislature, empowered to enact laws on the most interesting subjects, the whole character in which the States appear, underwent a change, the extent of which must be determined by a fair consideration of the instrument by which that change was effected.
This instrument contains an enumeration of powers expressly granted by the people to their government. It has been said, that these powers ought to be construed strictly. But why ought they to be so construed? Is there one sentence in the constitution which gives countenance to this rule? In the last of the enumerated powers, that which grants, expressly, the means for carrying all others into execution, Congress is authorized “ to make all laws which shall be necessary and proper” for the purpose. But this limitation on the means which may be used, is not extended to the powers which are conferred; nor is there one sentence in *188 the constitution, which has been pointed out by the gentlemen of the bar; or which we have been abie. to discern, that prescribes this rule. We do not, therefore, think ourselves justified in adopting it. W hat do gentlemen mean-, by a strict construction? If they, contend only against that enlarged con-: striiction, which, would extend words beyond their natural and obvious import, we might question the application of the term, but should not controvert the- principié. If they contend for that narrow construction which, in support of some theory not to be found in the constitution, would, deny to the government those powers which, the words of the grant,- as usually understood, import,, and which are consistenfwith the general views and objects of .the instrument; for that narrow construction, vyhichwould cripple, the government, and render it unequal tb the object for which it is declared to be instituted, and to which the powers given, as fairly understood, fender it competent; then we cannot-perceive the propriety of this strict construction, nor. adopt it as the rule by which the constitution is.to be expounded. As men, whose intentions, require no concealment, generally employ. the words which most directly and aptly éx-pr.ess the ideas they intend to convey, the enlightened,, patriots, who framed ;our constitution, and the people who adopted, it, must be understood to have employed. words in their natural sense, and to have intended .what they have said. If, from the imperfection of human language, there should be serious doubts respecting the. extent of any given |>ower, it is a well settled rule, that the objects *189 for which it was given, especially when those ob jects are expressed in the instrument itself, should have great influence in the construction. We know of no reason for excluding this rule from the present case. The grant does not convey power which might be beneficial to the grantor, if retained by himself, or which can enure solely to the benefit of the grantee; but is an investment of power for the general advantage, in the hands of agents selected for that purpose ; which-power can never be exercised by the people themselves, but must be placed in the hands of agents, or lie dormant. We know of nó rule for construing the extent of such powers, other than is given by the language of the instrument which confers them, taken in connex-ion, with the purposes for which' they were conferred.
The power legulating commerce ex-regulation of natation.
The words are, “ Congress shall have power i / . , - , 1to regulate commerce with foreign nations, and among the several States, and with the -Indian tribes.”
The subject to bewegulated is commerce ; and our constitution.being, as was aptly said at the bár, one of enumeration, and not of definition, to as-certaifi the extent of the power, it becomes necessary to settle the meaning of the word. The counsel for the appellee would limit it to traffic* to buying and selling, or the interchange of commodities, and do not admit that it comprehends navigation. This would restrict a general term, applicable to. many objects,. to one of its significations. Commerce, undoubtedly, is traffic, but it is something more .: it is intercourse. It describes the com *190 mercial intercourse between nations, and parts of nations, in all its branches, and is ■ regulated by prescribing rules fbr carrying on that intercourse. The mind can scarcely- conceive a system for regulating commerce between nations, which shall exclude all laws concerning navigation, which shall be silent on the admission of the vessels of the one nation into the ports of the other, and be confined, to prescribing rules for the conduct of individuals, in the actual employment of buying and selling, or of barter.
If commerce does not include navigation, the government of the Union has no direct power over that subject, and can make no law prescribing what shall constitute American vessels, or requiring that they shall be navigated by American seamen. Yet this power has been exercised from the commencement of the government, has been exercised with the consent, of all, and has been understood by all to bé a commercial regulation. AIL America understands, and has uniformly understood, the word “ commerce,” to comprehend navigation. . It was so understood; and must have been so understood, when the constitution was framed. The. power over commerce, including navigation, was one of the primary objects for which the people of America adopted their government, and must have been contemplated in. forming it. The convention must have used the, word in that sense, because all have understood it in that sense; and. the attempt to restrict it comes too late.
. If the opinion : that “ commerces” as the word is used in the constitution, comprehends nayiga *191 tion also, requires any additional confirmation, that additional confirmation is,-we think, .furnished by the words of the instrument itself.
it is a rule of construction, acknowledged by all, that-the exceptions from a power mark its extent ; for it would be absurd, as well as useless, -to except from a granted power, that which was not granted — that which the words of the grant could not comprehend. If, then, there are in the, constitution plain exceptions from the power over navigation, plain inhibitions to the exercise of that power in a particular way, it is a proof that those who made these exceptions, and prescribed these inhibitions, understood the power to which they applied as being granted.
The 9th section of the 1st article declares, that “ no preference shall be given, by any regulation of commerce or revenue, to the ports of one State over those of another.” This clause cannot he understood as applicable to those laws only which are passed for the purposes of revenue, because it is expressly applied to commercial regulations ; and the most obvious preference which can be given to one port over another, in regulating commerce, relates to navigation. But the subsequent part of the sentence is still more explicit. It is, a: nor shall vessels bound to or from one-State, be obliged to enter, clear, or pay duties, in another.” These words have a direct reference to navigation.
The universally acknowledged power of the government to impose embargoes, must also, bé considered as showing, that all America is united *192 in that construction which .comprehends: navigation in the word commerce. . Gentlemen have said, in argument, that this is a branch of the war-making power, and that an embargo is an instrument of war, not a regulation of trade:
That it may be, and often is, used as an instru.ment of war, cannot be denied. An embargo may be imposed for the purpose of facilitating the equipment or manning of a fleet,, or for the purpose of concealing the progress of an expedition preparing to sail from a particular port. In these, and in similar cases, it is a military instrument, and -partakes of the. nature of war. But all émbargóes are not of this déscription. They are sometimes resorted to without a view to war, and with a single view , to commerce. In such case, an embargo is np more a war measure, than a merchantman is a'ship of:war, because both áre vessels , which ^navigate the ocean; with sails and seamen.
When Congress imposed that embargo which, fora time, engaged the attention of every man- is the United Statés, the avowed object bf the law. was, the protection of commerce, and the avoiding of war. By its friends and its enemies it was treatéd as a commercial, not as a war measure, The persevering earnestness, and zeal with which it was opposed, in a part of. our countrywhieh supposed its. interests to be vitally affected by the act, cannot be forgotten. A want of acuteness in discovering objections to a measure to. which they ferlt the most deep rooted hostility, will not bé imputed to those who were arrayed in opposi *193 tion to this. Yet they never suspected that navigation was no branch of trade, and was, therefore, not comprehended in the power to regulate commerce,; They did, indeed, contest the constitutionality of the act, but, on a. principle which admits the construction for which the appellant, contends. They denied, that the particular law in question was made in pursuance of the constitution, not.because the power could not act directly on vessels, but because a perpétu.al embargo was the annihilation, and not the regulation of commerce. In terms, they admitted the applicability of the words used in the constitution to vessels] and that, in a case which produced a degree and an extent of excitement, calculated to draw forth every principle on which legitimate resistance could be sustained. No example, could more strongly illustrate the universal understanding of the American people on this subject.
The power to regulate comexte,lds every spe.of co,nmereial inter-between the Uni». states amt. tCns^aad^I the menm'i sw"firy of a
The word used in the constitution, then, comprehends, and has been always understood to comprehend,. navigation .within its meaning; and a power to regulate navigation, is as expressly granted, as if that term had been added tb the word “ commerce.”
•t „ To what commerce does this power extend ? _ i The constitution informs us, to commerce “ - ■ . • • • toreign nations, and among, the several 1 • , , T ’ and with the Indian tribes.
It has, we believe, been universally admitted, that these words comprehend every species commercial intercourse between the United States and foreign nations. No sort of trade can be *194 carried on between this-country and any other, to which this power does not extend. It has been truly sáid, that commerce, as the word is used in the constitution* is a unit, every part of which is indicated by the term.
But- it does not extend to a commerce piateiy inter-ual.
If this be the admitted meaning of the word, in its application to foreign nations, it must carry the same meaning throughout the sentence, aiid remain a unit, unless there be some plain intelligible cause which alters it.
The subject to which the power is next applied, is to commerce “ among the several States.” The word “ among’’ means intermingled with. A thing which is among others, is intermingled with them. Commerce among the States, cannot stop at the external boundary line of each State, but may be introduced into the. interior.
it js not intended to say that, these words com-J prehend that commerce, which is completely internal, which is carried on between man and man in a State, or between different parts of the same State, and which does not extend to or affect other States. Such a power would be inconvenient, and is certainly unnecessary.
. Comprehensivo as the word “ among” is, it may very properly be restricted to that commerce which concerns more States than -one. The phrase is not one which would probably have been selected to indicate the completely interior traffic of a State, because it is not an apt phrase for that purpose; and the enumeration of the particular classes of commerce,., to which the power was to be extended, would ndt have been made, .had the inten- *195 tioii been to extend the .power , to ¿very deseription. The enumeration presupposes something not enumerated; and that something,. if we regard the language or the subject of the sentence, must be the exclusively internal commerce of a State. The genius and character of the whole government seem to be, that its action is to be applied to all the external concerns of the nation, and to those internal concerns which affect the States generally; but not to those which are completely within a particular State, which dQ not affect other States, and with which it is not necessary to interfere, for the purpose of executing some of the general powers of the government. The completely internal commerce of a State, then, may be considered as reserved for the State itself.
But, in regulating commerce with foreign nations, the power of Congress does not stop at the jurisdictional lines of the several States. It would be a very useless power, if it could not pass those lines. The commerce of the United States with foreign nations, is that of the whole United States. Every district has a right’to participate in .it. The 'deep streams which penetrate our country in every direction, passthrough the interior of almost eyery State in the Union, and furnish the means of exercising this right. If Congress has the power to regulate it, that power must be exercised whenever the subject exists. If it exists within the States, if a foreign voyage may commence or terminate at a port within a State, then the power of Congress may be exercised within a State.,
This principle is, if possible, still more clear, when *196 applied to commerce “ among the several States.” They either join each other, in which case they are separated by a mathematical line, or they are remote from each other, in which case other States lie between them. What is commerce “amóng” them; and how is it tb be conducted? Can a trading expedition between two adjoining States, commence and terminate outside of each ? And if the trading intercourse be between two States remote from each other, must it not commence in one, terminate in thé other, and probably pass through a third ? Commerce among the States must, of necessity, be commerce with the States. In the regulation of trade with the Indian tribes, the action of the law, especially when the constitution was made, was chiefly within a State. The power of Congress, then, whatever it may be, must be exercised within the territorial jurisdiction of the several States. The sense of the nation on this subject, is unequivocally manifested by the provisions made in the laws for transporting goods, by land, between Baltimore and Providence, between New-York and Philadelphia, and between Philadelphia and Baltimore.
The power to regulate commerce is general, and general, and has no limitations but such as are prescribed in the constitution itself.
We are now arrived at the inquiry — What is this power ?
It is the power to regulate; that is-, to prescribe the rule by which c.ommerce is to be governed, This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, arid acknowledges no limitations, other than are prescribed in the constitution. These are. expressed in plain terms, and do not affect the *197 questions which arise in this case, or which have been discussed at the bar. If, as has always been. • * understood, the sovereignty of Congress, though limited to specified objects, is plenary as to those objects, the power over commerce with foreign’ná-tions, and among the several States, is vested'in Congress as absolutely as it would be in a single government, having in its constitution the same restrictions on the exercise of the powér as are found, in the constitution of the United States. The.wisdom and the discretion of Congress, their identity with the people, and the influence which their constituents possess at elections, are, in. this, as in many other instances, as that, for example* of declaring war, the sole restraints on which they have relied, to secure them from its abuse. They are the restraints on which the people must often rely. solely, in all representative governments.
The power of Congress, then, comprehends navigation, within, the limits of every State in the Union; so far as that navigation may be, in any manner, connected with “commerce with foreign nations, or among the several States, or with the Indian tribes.” It may, of consequence, pass the jurisdictional line of New-York, and act upon the very waters to which the prohibition now under consideration applies.
But it has been Urged with great earnestness, that, although the power of Congress to regulate. commerce with foreign nations, and among the several States, be co-extensive with the subject itself, and have no. other limits than are prescribed in the constitution, yet the States may severally *198 exercise the same power, within their respective jurisdictions. In support of this argument, it is said, that they possessed it as an inseparable attribute of sovereignty, before the formation of the constitution, and still retain it, except so far as they have surrendered it by that instrument; that this principle results from the nature of the government, and is secured by the ténth amendment; that an affirmative grant of power is not exclusive, unless in its own nature it be such that the continued exercise of it by the former possessor is inconsistent with the grant, and that this is not of that description.
The power to* regulate commerce, so far as it extends, is exclusively vested in Congress, and uo part of* it can be exercised fry a State.
The appellant, conceding these postulates, except the last, contends, that full power to regulate a particular subject, implies the whole power, and leaves no residuum; that a grant of the whole is incompatible with the existence of a right in another to any part of it.
Both parties have appealed to the constitution, to legislative acts, and judicial decisions; and have drawn arguments from all these sources, to support and illustrate the propositions they respectively maintain.
The grant of the power to lay and collect taxes is, like the power to regulate commerce, made in general terms, and has never been understood to interfere with the exercise of the same power by the States; and hence has been drawn an argument which has been applied to the question under consideration. But the two grants are not, it is conceived, similar in their terms or their -nature. Although many of the powers formerly *199 exercised by the States, are < transferred to the government of the Union, yet the State governments remain, and constitute a . ijiost important part of our system. The power of taxation is indispensable to their existence, and is a power which, in its own nature, is capable of residing in, and being exercised by, different authorities at the same time. We are accustomed to see it. placed, for different purposes, in different hands. Taxation is the simple operation of taking small portions from a perpetually accumulating mass, susceptible of almost infinite division; and a power in one to take what is necessary for certain purposes, is not, in its nature, incompatible with a power in another to take what is necessary for other purposes. Congress is authorized to lay and collect taxes, &c. to pay the debts, and provide for the common defence and general welfare of the United States. This does not interfere with the power of the States to tax for the support of their own governments; nor is the exercise of that power by the States, an exercise of any portion of the power that is granted to the United States. In imposing taxes for State -purposes, they are not doing what Congress is empowered to do. Congress is not empowered to tax for those purposes which are within the exclusive province of the States. When, then, each government exercises the power of taxation, neither is exercising the power of the other. But, when a State proceeds to regulate commerce with foreign nations, or among the several States^, it is exercising the very power that is granted to Congress, *200 and is doing the very thing which Congress is authorized to do. There is no analogy, then, between the power of taxation aüd the power of regulating commerce.
In discussing the question, whether this power is still in the States, in the case under consideration, we may dismiss from it the inquiry, whether it is surrendered by the mere grant to Congress, or is retained until Congress shall exercise the power. We may dismiss that inquiry, because it has been exercised, and the . regulations which Congress deemed it proper to make, are how in full operation. The sole question is, . can a State regulate commerce with fpreign nations and among the States, while Congress is regulating it ?
. The counsel for the respondent answer this question in the affirmative, and rely very much on the restrictions in the 10th section, as supporting their opinion. They say, very truly, that limitations of. a power, furnish a strong argument in favour of the existence of that power, and that the section which prohibits the States from laying duties on imports or exports, proves that this power might have been exercised, had it not been expressly forbidden; and, consequently, that any other commercial regulation, not expressly forbidden, t to. which the original power of the State was. competent, may still be made.
. That this restriction shows the opinion, of the Convention, that a State might impose duties on exports and imports, if not expressly forbidden, will be conceded ; but that it follows as a conse *201 quence, from this concession, that a State may regulate commerce with foreign nations and among the States, cannot be admitted.
We must first determine whether the act of laying “ duties or imposts on imports or exports,” is considered in the constitution as a branch of the taxing power, or of the power to regulate commerce. We think it very clear, that it is considered as a branch of the taxing power. It is so treated in the first clause of the 8th section: “ Congress shall have power to lay and collect taxes, duties, imposts, and excises;” and, before commerce is mentioned, the rule by which the exercise of this power must be governed, is declared. It is, that all duties, imposts, and excises, shall be uniform. In a separate clause' of the enumeration, the power to regulate commerce is given, as being entirely distinct from the right to levy taxes and imposts, and as being a new power, not before conferred. The constitution, then, considers these powers as substantive, and distinct from each other; and so places thefn in the enumeration it contains. The power of imposing duties on imports is classed with the power to levy taxes, and that seems to be its natural place. But the power to levy taxes could never be considered as abridging the right of the States on that subject; and they might, consequently, have exercised it ’svying duties on imports or exports, had the constitution contained no prohibition on this subject. This, prohibition, then, is an exception from the acknowledged power of the States *202 to levy taxes, not from the questionable power to regulate commerce.
“A duty of tonnage” is 'as much a tax, as a ¿yjy. on imports or exports; and. the reason which induced the prohibition of those taxes, extends to this also. This tax may be imposed by a State, with the consent of Congress; and it may be admitted, that Congress cannot give a right to a State, in virtue of its own powers. But a duty of tonnage being part of the powér of imposing taxes, its prohibition may certainly be made to depend on Congress, without affording any implication respecting a power to regulate commerce. It is true, that duties may often be, and in fact often are, imposed on tonnage, with a view to the regulation, of commerce; but they may be also imposed with a view to revenue; ánd it was, therefore, a prudent precaution, to prohibit the States frbm exercising this power. The idea' that the same measure might, according to circumstances, be arranged with different classes of power, was no novelty to the framers of our constitution.. Those illustrious statesmen and patriots had, been, many of them, deeply engaged in the discussions which preceded the war of our revolution; and all of them were well read in those discussions. The right to regulate commerce, even by the imposition of duties, was not controverted ; but the right to impose a duty for the purpose of revenue, produced a war as important, perhaps, in its consequences to the human race, as any the world has ever witnessed.
These restrictions, then, are on the taxingpower, *203 not on that to regulate commerce; and presuppose the existence of that which they restrain, not of that which they do not purport to restrain.
State inspection laws, health laws, and laws for regulating the internal commence of a State, and those which respect turnpike roads, ferries, &c. are not within the power granted to Congress.
But, the inspection laws are said to be regulations of commerce, and are certainly recognised in the constitution, as being passed in the exercise of a power remaining with the States.
That inspection laws may have a, remote and considerable influence on commerce, will not be denied ; but that a power to regulate commerce is the source from which the right to pass them is derived, cannot be admitted. The object of inspection laws, is to improve, the quality of articles produced by tjie labour of a country ; to fit them, for exportation; or, it may be, for domestic use. They act upon the subject before it becomes an article of foreign commerce, or of commerce among the States, and prepare it for that purpose. They form a portion of that immense mass of legislation, which embraces every thing within the territory of a State, not surrendered to the general government : all which can be most advantageously exercised by the States themselves. Inspection laws, quarantine laws, health laws of every description, as well as laws for regulating the internal commerce of a State, and those which respect turnpike roads, ferries, &c., are component parts of this mass.
No direct general power over these objects is granted to Congress ; and, consequently, they remain subject to State legislation. If the legislative ;power of the Union can reach them, it must be for national purposes; it must be where the *204 power is expressly given for a special purpose, pi* is clearly incidental to some power which is express] y. given. It is obvious, that the government of the Union, in the exercise of.its express powers, that, for example, of regulating commerce with foreign nations and among the States, mayase means that may also be employed by a State, irf the exercise Of its acknowledged powers; that, for example, of regulating commerce within the State. If Congress license vessels to sail from one port to another, in the same State, the act is supposed to be, necessarily, incidental to the power expressly granted to Congress, and implies no claim of a direct power to regulate the purely internal commerce of a State, or to act directly on its system of police. So, if a State, in passing laws on subjects acknowledged to be within its control, and with a view to those subjects, shall adopt a measure of the same character with one which Congress may adopt, it does not derive its authority from the particular power which has been granted, but from some other, which remains with the State, and may be executed by the same means. All experience shows, that the same measures, or measures scarcely distinguishable from each other, may flow from distinct powers; but this does not prove that the powers themselves are identical. Although the means used in their execution may sometimes approach each other so nearly as to be confounded, there are other situations in which they are sufficiently distinct to establish their individuality.
In our complex system, presenting the rare and difficult scheme of one general government, whose *205 fiction extends over the whole, but whicli possesses only certain enumerated powers ; and of nufñe-rous State governments, which retain and exercise all powers not delegated to the Union, contests re^-specting power must arise. Were it even otherwise, the measures taken by the respéctive governments to execute their acknowledged powers, would often be of the same description, and might, sometimes, interfere. This, however, dbes not' prove that the one is exercising, or has a right to exercise, the powers of the other.
The acts of Congress, passed in 1796 and 1799,a empowering .and directing the officers of the general government to. conform to, and assist in the execution of the quarantine and health laws of a State, proceed, it is said, upon the idea that these laws are constitutional. It is undoubtedly true, that they do proceed upon that idea; and the constitutionality of such laws has never, so far as we are informed, been denied. But the)' do not imply an acknowledgment that a State may rightfully regulate commerce with foreign nations, or among the States ; for they db not imply that such laws are an exercise of that power, or enacted with a view to it. On the contrary, they a^e treated as quarantine and health laws, áre so denominated in the acts of Congress, and are considered as flowing from the acknowledged power of a State, to provide for the health of its citizens. But, as it was apparent that some of the provisions made for this purpose, and in virtue of this power, might *206 interfere with, and be affected by the laws of the United States, made for the regulation of commerce, Congress, in that spirit of harmony and conciliation, which ought always to characterize the conduct of governments standing in the relation which that of the Union and those df the States bear to each other, has directed its officers to aid in the execution of these laws; and has, in some measure, adapted its own legislation to this object, by making provisions in aid of those of the States. But, in making these provisions, the opinion is unequivocally manifested, that Congress may control the State laws, so far as it may be necessary to control them, for the regulation of commerce.
The act passed in 1803,a prohibiting the importation of slaves into any State which shall itself prohibit their importation, implies, it is said, an admission that the States possessed the power to exclude or admit them; from which it is inferred, that they possess the same power with respect to other articles.
If this inference were correct; if this power was exercised, not under any particular clause in the constitution, but in virtue of a general right over the subject of commerce, to exist as long as the constitution itself, it might now be exercised. Any State might now import African slaves into its own territory. But it is obvious, that the power of the States over this subject, previous to the year 1808, constitutes an exception to the power of *207 Congress to regulate commerce, and the exception is expressed in such words, as to manifest clearly the intention to continue the pre-existing right of the States to admit or exclude, for a limited period. The words are, “ the migration or importation of such persons as any of the States, now existing, shall think proper to admit, shall e pro ited by the Congress prior to the year lo08. The whole object of the exception is,- to preserve the power to those States which might be disposed to exercise ii; and its language seems to the Court to convey this idea unequivocally.- The possession of this particular power, then, during the time limited in the constitution, cannot be admitted to prove the possession of any other- similar, power.
It has been said, that the . act of August 7, 1789, acknowledges a concurrent power in the States to. regulate the conduct of pilots, arid hence is inferred an admission of their concurrent right with Congress to regulate commerce with foreign nations, and amongst the States. But this infer-, ence is not, we think, justified by the fact.
Although Congress cannot enable a State to legislate, Congress may adopt the provisions of a Staie on any subject. When the government of the Union was brought into existence, it found a system for the regulation of its pilots in full force in every State. The act which has been mentioned, adopts this system, and gives it the same vaii-dity as if its provisions had been specially made by Congress. But the act, it may be said, is. prospective also, and the adoption of laws to be made *208 in future, presupposes the right in the maker to legislate on the subject. °
• • 71 The act unquestionably manifests an intention to }eave th¡s subject entirely to the States; until Congress should think proper to interpose; but the very enactment of such a law indicates an opinion that it was necessary; that the existing system would not be applicable to the new state of things, unless expressly applied to it by Congress, But this section is confined to pilots within the “bays, inlets, rivers, harbours, and ports of the United States,” which are, of course, in whole or in part, also within the limits of some particular state. The acknowledged power of a State to regulate it's police, its domestic trade, and to govern its own citizens, may enable it to legislate on this subject, to a considerable extent; and the adoption of its system by Congress, and the application of it to the whole subject of commerce, does not seem to the Court to imply a right in the States so to apply it of their own authority . Bút the adoption of the State system being temporary,, being only “until further legislative provision shall be made by Congress,” shows, conclusively, an opinion that Congress could control the whole subject, and might adopt the system of the. States, or provide one of its own.
A State, it is said, or even a private citizen, may construct light houses. But gentlemen must, be aware, that if this proves a power in a State to regulate commerce, it proves that the same power is in the citizen. States, or individuals who own lands, may, if not forbidden by law, *209 erect on those lands what buildings they please; but this power is entirely .distinct from that, of regulating commerce, and may, we presume, be restrained, if exercised so as to produce a public mischief.
These acts were cited at the bar for the purpose of showing an opinion in Congress, that the States possess, concurrently with the Legislature of the Union, the power to regulate commerce with foreign nations and among the States. Upon reviewing them, we think they do not establish the proposition they were intended to prove. They show the opinion, that the States retain powers enabling them to pass the laws to which allusion has been made, not that those laws proceed from the particular power which has been delegated to Congress.
. It has been contended by the counsel for the appellant, that, as the word “ tp regulate” implies in its nature, full power over the thing to be regulated, it excludes, necessarily,,.the. action of all others that would perform the same operation on the same thing. That regulation is designed for the entire result, applying to those parts which ré-main as they were, as well as to those whidh are altered. It produces a uniform whole, which is as much disturbed and deranged by changing what the. regulating power designs to leave untouched, as that on which it has operated.
. There is great force in this argument, and the Court is hot satisfied that it has been refuted..
Since, however, an exercising the power of regulating their own purely internal affairs, whether *210 of trading or police, the States may sometimes enact laws, the validity of which depends on their interfering with, and being contrary to, an act of Congress passed in pursuance of the constitution, the Court will enter upon the inquiry, whether the *aws New-York,- as expounded by the highest tribunal of that State, have, in their application . y , r' _ to this case, come into collision with an act of Congress, and deprived a citizen of a right to which that act entitles him. Should this collision exist, it will be immaterial whether those laws ^ere passed in virtue of a concurrent power to regulate commerce with foreign nations and among' the several States,” or, in virtue of a power reguIate their domestic trade and police. In one case' and the other, the acts of New-York must yield to the law of Congress; and the. deoisustaining the privilege they confer, against right given by a law of the Union, must be erroneous.
u'v'^ranting r RF^tbe exd ciusiverightof navigating the waters of that eteam boats, wUhM^'a'ct" reguiathig^The suan'ce'ofPtbé 4reStsupre”ñe lawsmust yieia to that eveneraathough hdgedfo"™-a S,in the
This opinion has been frequently expressed in this Court, and is founded, as well on the nature of the government as on the words of the constitution. In argument, however, it has been icon-tended, that if a law passed by a. State, in the exercise of its acknowledged sovereignty, comes into conflict with a law parsed by. Congress in pursuance of the. constitution, they affect the subject, and each other, like equal Opposing powers.
But the framers of our constitution foresaw this ' state of things, and provided for it, by declaring the supremacy not only of itself, but of the laws inade in pursuance of it. The nullity of any act, *211 inconsistent with the constitution, is produced by the declaration, that the constitution is" the supreme law. The appropriate application of that part of the clause which confers the same supre^ rnacy on laws and treaties, is to such acts of the State Legislatures as do not transcend their powers, but, though enacted in the execution of acknowledged State powers, interfere with, or are contrary to the laws of Congress, made in pursuance of the constitution, or some treaty made under the authority of the United States. In every such case, the act of Congress, or . the treaty, is supreme; and the law of the State, though enacted ,i« the exercise of powers not controverted, must yield to it.
In pursuing this inquiry at the bar, it has been said, that the constitution does not confer the right of intercourse between State and State. That fight derives its source from those laws whose authority is acknowledged by civilized man throughout the world. This is true. The constitution found it an existing right, and gave to Congress the power to regulate it. In the exercise of this jpower, Congress has passed “ an act for enrolling , or licensing ships or vessels to be employed in the coasting trade and fisheries, and for regulating the same.”. The counsel for the respondent contend, that this act does not give the right to sail from port to port, but confines itself to regulating a pre-existing right, so far only as to confer certain privileges on enrolled and licensed vessels in its exercise.
It will at once occur, that, whefi a Legislature *212 attaches certain privileges and exemptions to the exercise of a right over which its control is absolute, the law must imply a power to exercise the right. The privileges are gone, if the right itself be annihilated. It would be contrary to all reason, and to the course of human affairs, to say that a State is unable to strip a vessel of the particular privileges attendant on the exercise of a right, and yet may annul the right itself; that the State of New-York cannot prevent an enrolled and licensed vessel, proceeding from Elizabethtown, in New-Jersejy, to New-York, from enjoying,' in her course, and on her entrance into port, all, the privileges conferred by the act of Congress; but can shut her up in her own port, and prohibit altogether her entering the waters and ports of another State. To the Court it seems very clear, that the whole act on the subject of the coasting trade, according to those principles which govern the construction, of statutes, implies, unequivocally,, an authority to licensed vessels to carry on the, coasting trade.
the acts of . congress for coasifnguade8, fionStopecá" ry that nade.
But we will proceed briefly to notice those see- . .. , , , . tions which bear more directly on the subject. The first section declares, that vessels enrolled by virtue of a previous law, and certain other ves-sejg? enroned as described in that act, and having al cense, in force, as is by the act required, “and no others, shall be deemed ships or vessels of the "United States, entitled to the. privileges of ships qv vessels employed in the coasting trade.” '
This section seems to the Court to contain a positive enactment, that the vessels it describes shall *213 be entitled to the privilegesof ships or vessels era-ployed in the coasting trade. Thesé privileges cannot be separated from the trade, and cannot be enjoyed, unless the trade may be prosecuted. The grant of the privilege is an idle, empty form, conveying nothing, unless it convey the right to which the privilege is attached., and in the exercise of which its whole value consists. To construe these words otherwise than as entitling the ships or vessels described, to carry on the coasting trade, would be, we think, to disregard the apparent intent of the act.
The fourth section directs the proper officer to grant to a vessel qualified to receive it, “ a license for carrying on the coasting tradeand prescribes its form. After reciting the compliance of the applicant with the previous requisites of .the law, the operative words of the instrumentare, “license is hereby granted for the said steam-boat, Beilona, to be employed in carrying on the coasting trade for one year from the date hereof, and no longer.”
These are not the words of the officer; they are the words of the legislature; and convey as explicitly the .authority the act intended to give, and opérate as effectually, as if they had been inserted in any other part of the act, than in the license itself..
The word “license,” means permission, or authority; and a license to do any particular thing, is a permission or authority to do that thing; and if granted by a person having power to grant it, transfers to the grantee the right to do whatever it purports. to authorise. It certainly transfers to *214 him all the right which the grantor can transfer, to do what is within the terms of the license.
The license is not merely intended to confer the national' character.
Would the validity or effect of such an instrument be questioned by the respondent, if executed by persons claiming regularly under the laws of New-York ?
The license must be understood to be what it purports to be, a legislative authority to the steamboat Bellona, “to be employed in carrying on the coasting trade, for one year from this date.’1
It has. been denied that these words authorize a voyage from New-Jersey to New-York. It is true, that no ports are specified ; but it is equally true, that the words used are perfectly intelligible, and do confer such authority as unquestionably, as if the ports had been mentioned. The coasting trade isa term well understood. The law has defined it; and all know its meaning perfectly. The act describes, with great minuteness, the various operations of a vessel engaged in it; and it cannot, we think, be doubted, that a voyage from New-Jersey to New-York, ife.one of those opérations.
Notwithstanding the decided language of the license, it has also been maintained, that it gives no right to trade; and that its sole purpose is to confer the American character.
The answer given to this argument, that the American character is conferred by the enrolment, and not by the license, is, we think, founded too clearly in the words of the law, to require the sup-, port of any additional observations. The enrolment of vessels designed for the coasting trade, corresponds precisely with the registration of ves- *215 seis designed for the foreign . trade, and requires every circumstance which can constitute the American character, The license can be granted only to vessels already enrolled, if they be of the bur-then of twenty tons and upwards ; and requires no circumstance essential to the American character. The object of the license, then, cannot be to ascertain the character of the vessel, but to do what it professes to do — that- is, to give permission to a vessel already proved by her enrolment to be American; to carry on the coasting trade.
The power of regulating commerce extends to navigation carried on by vessels exclusively employed iii transporting passengers*
But, if the license be a permit to carry on the coasting trade, the respondent deniés that these boats were engaged in that trade, or that the decree under, consideration has restrained them from prosecuting it. The boats of the appellant were, we aré told, employed in the transportation of passengers ; and this is no part of that commerce which Congress may regulate.
If, as our whole course of legislation on this subject shows, the power of Congress has been universally understood in America, to comprehend navigation, it is a very persuasive, if not a conclusive argumént, to prove that the construction is correct; and, if it be correct, no clear distinction is perceived between the power to regulaté vessels employed in transporting men for hire, and property for hire. The subject is transferred to Congress, and no exception to the grant can be adr mitted, which is not proved by the words or the nature of the thing. A coasting vessel employed in the transportation of passengers, té as much a portion of the American marine, as one employed *216 in the transportation of a cargo and no reason is perceived why such vessel should be withdrawn *, ■ ■ , froto the regulating power or that government, which has been thought best fitted for the purpose generally. The provisions of the law respecting native seamen, andrespectingownership,are as applicable to vessels carrying men, as to vessels carrying manufactures ; and no reason is perceived why the power over the subject should not be placed in the same hands. The argument urged at the bar, rests, on the foundation, that the power of Congress does not extend to navigation, as a branch of commerce, and can. only be applied tp that subject incidentally and occasionally. But if that foundation be removed, we must show some. plain, intelligible distinction, supportéd by the constitution, or>by reason, for discriminating between the power of Congress over vessels employed in navigating, the samé seas. We can perceive no such distinction.
If we refer to the constitution, the inference to be drawn from it. is rather against the distinction. The section which restrains Congress from prohibiting the migration or importation of such persons as any of the States may think proper to ad-tnit, until the year: 1808, has always been considered as an exception from the power to regulate commerce, and certainly seems to class migration .with importation. Migration applies as appropriately to voluntary, as importation does to involuntary, arrivals ; and, so far as an exception from a power proves its existence, this section proves that the power to regulate commerce applies equal *217 ly to the regulation of vessels employed in transporting men, who pass from place to place voluntarily, and to those who pass involuntarily.
If the power reside in Congress, as a portion of the general grant to regulate commerce, then acts applying that power to vessels generally, must be construed as comprehending all vessels. If none appear to be excluded by the language of the act, none can be excluded by construction. Vessels have always been employed to a greater or less extent in the transportation of passengers, and have never been supposed to be, on that account, withdrawn from the control or protection of Congress. . Packets which ply along the coast, as well' as those which make voyages between Europe and America, consider the transportation of passengers as an important part of their business. Yet it has never been suspected that the general laws of navigation did not apply to them.
The duty act, sections 23 and 46, contains provisions respecting passengers, and shows, that vessels which transportthem, have the same, rights, and must perform the same duties, with other vessels. They are governed by the general laws of navigation.
In the progress of things,, this seems to have grown into a particular employment, and to have attracted the particular attention of government. Congress was no longer satisfied with comprehending vessels engaged specially in this business, within those provisions which were intended for vessels generally; and, on the 2d of March, 1819, passed “ an act regulating passenger ships and ‘ *218 vessels.” This wise and humane- law provides for the safety and comfort of passengers, and for . the communication of every thing concerning them which may interest the government, to the Department of State, but makes ho provision concerning the entry of the vessel, or her conduct in the waters of the United States. This, we think, shows conclusively the sense of Congress, (if, indeed, any evidence to that point could be re-, quired,) that the pre-existing regulations comprehended passenger ships among others; and, in prescribing the same duties, the Legislature must have considered them as possessing the same rights.
If; theft, it were even true, that the Bellona and the Stoudiiiger were employed exclusively in the conveyance of passengers between New-York and New-Jersey, it would not follow that this occupation did not constitute a part of the coasting trade of the United States, and was not protected by the license annexéd to the answer. But we cannot perceive how the occupation of these vessels can be. drawn into question, in the case before the Court. The laws of New-Yofk, which grant the exclusive privilege set up by the respondent, take no notice of the employment of vessels, and relate Only to the principle by which they are pror pelled. Those .laws do not inquire whether vessels are engaged in transporting men or merchandise, but whether they áre moved by steam or wind. If by the former, the waters of New-York arc closed against them, though their cargoes be dutiable goods, which the laws of the *219 United States permit them to enter and deliver in New-York. If by the latter, those waters are free to them, though they should carry passengers only. In conformity with the law, is the bill of the plain tiff in the State Court. The bill does not complain that the Bellona and the Stoudinger carry passengers, but. that they are moved by steam. This is the injury pf which he complains, and is the sole injury against the continuance of which he asks relief. The bill does not even allege, specially, that .those vessels were employed in the transportation of passengers, but says, generally, that they were employed “ in the transportation of passengers, or otherwise.” The answer avers, only, that they were employed in fhe coasting trade, and insists on the right to carry on any trade authorized by the license. No testimony is taken, and the writ of injunction and decree restrain these licensed vessels, not from carrying passengers, but from being moved through the waters of New-Yo^k by steam, for any purpose whatever.
The power of regulating commerce extends to vessels propelled by steam or fire, as well as to those navigated by the instrumentality of wind and sails.
The questions, then, whether the conveyance of passengers be a part of the coasting trade, and whether a vessel can be protected in that occupation by a coasting license, are not, and cannot be. raised in this case. The real and sole question seems to be, whether a steam machine, in actual use, deprives a vessel of the privileges conferred by a license. **
In considering this question, the first idea which presents itself, is, thát the laws of Congress for the- regulation .of commerce, do not look to the *220 principle by which vessels are moved. That sub-' ject is left entirely to individual discretion; and, in that vast. and complex system of legislative enactment concerning it, which embraces every thing that the Legislature thought it necessary to notice, there is not, we believe, one word respect-. ing the peculiar principle by which vessels are propelled through the water* except what may be found in a single act, granting a particular privilege to steam boats. With this exception, evexy act, either prescribing duties, or granting privileges, applies to every- vessel, whether nayigated by the instrumentality of Wind or fire, of sails or machinery. The whole weight of proof, then, is thrown, upon him who would introduce a distinction to which the words of .the law give no countenance.
If a real difference could be admitted to exist between vessels carrying passengers and.others, it has already been observed, that there is no fact in this case which can bring up that question. And, if the occupation of steam boats be a matter of such general notoriety, that the Court- may be presumed to kn< w it,, although not specially informed by the record, then we deny that the transportation of passengers is their exclusive occupation. It is a matter of. general history, that, in our western waters, their principal employment is the transportation of merchandise; and all know, that in. the waters of the Atlantic they are frequently so employed.
But all inquiry into this Subject seems to the Court, to be put completely at rest, by the act al *221 ready mentioned, entitled, “ An act for the enrolling and licensing of steam boats.”
This act authorizes a steam boat employed, or intended to be employed, only in a river or bay of the United States, owned wholly or in part by an alien, resident within the United States, tobe enrolled and licensed as if the same belonged to a citizen of the United States.
This act demonstrates the opinion of Congress, that steam boats, may be enrolled and licensed, in common with vessels using sails. They are, of course, entitled to the same privileges,, and can no more be restrained from navigating watersj and entering ports which are free to such vessels, than if they were wafted on their voyage by the winds, instead of being propelled by the agency of fire. The one element may be as legitimately used as the other, for every commercial purpose authorized by the laws of the Union; and the act of a State inhibiting the use of either to any vessel having a license under the act of Congress, comes, we think, in direct collision with that act.
As this decides the cause, it is unnecessary to enter in an examination of that part of the constitution which empowers Congress to. promote the progress of science and the useful arts.
The Court is aware that, in stating the train of reasoning by which we have been conducted to this result, , much time has . been consumed in the attempt to demonstrate propositions which may have been thought axioms. It is felt that the tediousness inseparable from the endeavour to prove that which is already clear] is imputable to *222 a considerable part of this opinion. But it was unavoidable. The conclusion to which we have come, depends on a chain of principles which it was necessary to preserve unbroken;, and, although some of them were thought nearly self-evident, the magnitude of the question, the weight of character belonging to those from whose judgment we dissent, and the argument at the bar, demanded that we should assume nothing.
Powerful and ingenious minds, taking, as postulates, that the powers expressly granted to the government of the Union, are to be contracted by construction, into the narrowest possible com: pass, and that the original powers of the States. are retained, if any possible construction will retain them, may, by a course of well digested, but refined and metaphysical reasoning, founded on these premises, explain away the constitution of our country, and leave it, a magnificent structure) indeed; to look at, but totally unfit for use. They may so entangle and perplex the understanding, as to obscure principles, which were before thought quite plain, and induce doubts where, if the mind were to pursue its own course, none would be perceived. In such a case, it is peculiarly necessary to recur to safe and fundamental principles to sustain those principles, and when sustained, to make them the tests of the arguments to be examined.
Mr. Justice Johnson.
The judgment entered by the Court in this cause, has my entire approbation ; but having adopted my conclusions on views *223 of the subject materially different from those of my brethren, I feel it incumbent on me to exhibit those views. I have, also, another inducement: in questions of great importance and great delicacy, I feel my duty to the public best discharged, by an effort to maintain my opinions in my own way.
In attempts to construe the constitution, I have never found much benefit resulting from the inquiry, whether the whole, or any part of it, is tobe construed strictly, or literally. The simple, classical, precise, yet comprehensive language, in which it is couched, leaves, at most, but very little.latitude for construction; and when its intent and meaning is discovered, nothing remains but to execute the will of those who made it, in the best manner to effect the purposes intended. The great and paramount purpose, was to unite this mass of wealth and power, for the protection of the humblest individual; his rights, civil and political, his interests and prosperity, are the sole end; the rest are nothing but the means But the principal of those means, one so essential as to approach nearer the characteristics of an end, was the independence and harmony of the States, that they may the better subserve the purposes of cherishing and protecting the respective familiés of this great republic.
The strong sympathies, rather than the feeble government, which bound the States together during á common war, dissolved on the return of peace; and the very principles which gave rise to the war of the revolution, began to threaten the *224 confederacy with anarchy and ruin. The States had resisted a tax imposed by the parent State, and now reluctantly submitted to, or altogether rejected, the moderate demands-of the confederation. Every one recollects the painful and threatening discussions, which arose on the subject of the five per cent. duty. Some States rejected it altogether ; others insisted. on collecting it themselves; scarcely any acquiesced without reservations, which deprived it altogether of the character of a national measure; and at length, some repealed the laws by which they had signified their acquiescence.
For a century the States had submitted, with murmurs, to the commercial restrictions imposed by the parent State ; and now, finding themselves in the unlimited possession of those powers over their own commerce, which they had so long been deprived of, and so earnestly coveted, that selfish principle which, well controlled, is so salutary, and which, unrestricted, is so unjust and tyrannical, guided by inexperience and jealousy, began to show itself in iniquitous laws and impolitic measures, from which grew up a conflict of commercial regulations, destructive to the harmony of the States, and fatal to their commercial interests abroad.
This was the immediate cause, that led to the forming of a convention.
As early as 1778, the subject had been pressed upon the attention of Congress, by a memorial from the State of New-Jersey ; and in 1781, we find a resolution presented to that body, by one of *225 the most elilighteped men of his day,a affirming, that “it is indispensably necessary, that the United States, in Congress assembled, should bevested with a right of superintending the commercial re-
. gulations of every State, that hone may take place that shall be partial or contrary to the common interests.” The resolution of Virginia,b appointing her commissioners, to meet commissioners from other States, expresses their.purpose to be, “to take into consideration the trade of the United States,, to consider , how far an uniform system in their commercial regulations, may be necessary to their common interests and their permanent harmony.” And Mr. Madison’s resolution, which led to that measure, is introduced by a preamble entirely explicit to this point: “ Whereas, the relative situation Of the United States has been found, on trial, to require uniformity in their commercial regulations, as the only effectual policy for obtaining, in the ports of foreign nations, a stipulation of privileges reciprocal to those enjoyed by the subjects of such nations in the ports of.the United States, for preventing animosities, whieh cannot fail to arise among the several States, from the interference of partial and separate regulations,” &c. “therefore, resolved,” &c.
The history of the times will, therefore, sustain the opinion, that the grant of power over commerce, if intended to be commensurate with the evils existing, and the purpose of remedying those *226 evils, could be only commensurate with the power cf the States over th<? subject. And this opinion is supported by' a very remarkable evidence of the general understanding of the whole American people, when the grant was made.
There was not a State in the Union, in which there did not, at that time, exist a variety of commercial regulations; concerning which it is too much to suppose, that the whole ground covered by those regulations was immediately assumed by actual legislation, under the authority of the Union. But where was the existing statute on this subject, that a State attempted to execute ? or by what State was it ever thQtight necessary to repeal those statutes? By common consent, those laws dropped lifeless from their statute books, for want of the sustaining power, that had been relinquished to Congress.
And the plain and direct import of the words of the grant, is consistent with this general understanding.
The words of the constitution are, “ Congress shall have power to regulate commerce withfo-. reign nations, and among the several States, and with the Indian tribes.”
It is not material, in my view of the subject, to inquire whether the article a or the should be prefixed to the word “power.” Either, or neither, will produce the same result: if either, it is clear' that the article the would be the proper one, since the next preceding grant of power is certainly exclusive, to wit: “ to borrow money on the credit *227 of the United States.” But mere verbal criticism I reject.
Mv opinion is founded, on the application i>f the / *1 _ •, , . j, : words of the grant to the subject ot it.
The “power to regulate commerce,” here meant to be granted, was that power to regulate commerce which previously existed in the States. But what was that power ? The States were, unquestionably, supreme ; and each possessed that power over commerce, which is acknowledged to reside in every sovereign State. The definition and limits of that power are to be sought among the features of international law ; and, as it was not only admitted, but insisted, on by both parties, in argument, that, “ unaffected by a state of war, by treaties, or by municipal regulations, all commerce among independent States'was legitimate,” there is no necessity to appeal to the oracles of the jus communeKfor the correctness of that doctrine. The law of nations, regarding man as a social animal, pronounces all commerce legitimate in a state of peace, until prohibited by positive law. The power of a sovereign state over commerce, therefore, amounts to nothing more than a power to limit and restrain it at. pleasure. And since the. power to prescribe the limits to its freedom, necessarily implies the power to determine what shall remain unrestrained, it follows, that the power must be exclusive; it can reside but in one potentate; and hence, the grant of this power carries with it the whole subject, leaving nothing for the State to act upon.
And such has been the practical construction of *228 the act. Were every law on the subject of commerce repealed to-morrow, all commerce would be lawful; and, in practice, merchants never inquire what is permitted, but what is forbidden commerce. Of all the endless variety of branches of foreign commerce, now carried on to every quarter of the world, I know of no one that is permitted by act of Congress, any otherwise than by not being forbidden. No statute of the United States, that I know of, was ever passed to permit a commerce, unless in consequence of its having been prohibited by some previous statute.
I speak not here of the treaty making power, for that is not exercised under the grant now under sonsideration. I confine my observation to laws properly so called. And even where freedom of commercial intercourse is made a subject of stipulation in a treaty, it is generally with a view to the removal of some previous restriction; or the introduction of some new privilege, most frequently, is identified with the return to a state of peace. But another view of the subject leads directly to the same conclusion. Power to regulate foreign commerce, is given in the same words, and in the same breath, as it were, with that over - the commerce of the States and with the Indian tribes. But the power to regulate foreign commerce is necessarily exclusive. The States are unknown to foreign nations; their sovereignty exists only with relation to each other and the general government. Whatever regulations foreign commerce should be subjected to in the ports of the Union, the general government would be *229 held responsible for them; and all other regulations, but those which Congress had imposed, would be regarded by foreign nations as trespasses and violations of national faith and comity.
But the language which grants the power as to one description of Commerce, grants it as to all; and, in fact, if ever the exercise of a right, or acquiescence in a construction, could be inferred from contemporaneous and continued assent, it is that of the exclusive effect of this grant.
A right over the subject has never been pretended to in any instance, except as incidental to the exercise of some other unquestionable power.
The present is an instance of the assertion of that kind, as .incidental to a municipal power; that of superintending the internal concerns of a State, and particularly of extending protection and patronage, in the shape of a monopoly, to genius and enterprise.
The grant to Livingston and Fulton, interferes with the freedom of intercourse among the States; and on this principle its constitutionality is contested.
When speaking of the power of Congress over navigation, I do not regard it as a power incidental to that of. regulating commerce ; I consider it as the thing itself; inseparable from it as vital motion is from vital existence.
Commerce, in its simplest signification, means an exchange of goods; but in the advancement of society, labour, transportation, intelligence, cáre¿ and various mediums of exchange, become commodities, and enter into commerce; the sub *230 ject, the vehicle, the agent, and their various operations, beeome the objects of commercial regulation. Ship building, the carrying trade, and propagation of seamen, are such vital agents of commercial prosperity, that the nation which could not legislate over these subjects, would not possess power to regulate commerce.
That such was the understanding of the framers of the constitution, is conspicuous from provisions contained in that instrument.
The first clause of the 9th section, not only considers the right of controlling personal ingress or migration, as implied in the powers previously vested in Congress over commerce, but acknowledges it as a legitimate subject of revenue. And, although the leading object of this section undoubtedly was the importation of slaves, yet the words are obviously calculated to comprise persons of all descriptions, and to recognise in Congress a power to prohibit, where the States permit, although they cannot permit when the States prohibit. The treaty making power undoubtedly goes further. So the fifth clause of the same section furnishes an exposition of the sense of the Convention as to the power of Congress over navigation : “ nor shall vessels bound to or from one State, be obliged to enter, clear, or pay duties in another.”
But, it ié almost labouring to prove a self-evident proposition, since the sense of mankind, the practice of the world, the contemporaneous assumption, and continued exercise of the power, and universal aequiesce'nce, have so clearly esta *231 blished the right of Congress over navigation, arid the transportation of both, men and their goods, as not only incidental to, but actually of the essence of, the power to regulate commerce. As to the transportation of passengers,. and passengers in a steam boat, I consider it as having been solemnly recognised by the State of New-York, as a .subject both of commercial regulation and of revenue. She has imposed a transit duty upon steam boat passengers arriving at Albany, and unless this be done in the exercise of her control over personal intercourse, as incident to internal commerce, I know not on what principle the individual has been subjected to this tax.. The subsequent imposition upon the steam boat itself, appears to be but a commutation, and operates as an indirect instead of a. direct tax upon the same subject. The passenger pays it at last.
It is impossible, with the views which I entertain of the principle on which the commercial privileges of the people, of the United States, among themselves, rests, to concur in the view which this Court takes of the effect of the coasting license. in this cause. 1 do not regard it as the foundation of the right set up in behalf of the appellant. If there was any one object riding over every other in the adoption of the constitution, it was to keep the commercial intercourse among the States free from all invidious and partial restraints. And I cannot oyercome the conviction, that if the licensing act was repealed to-morrow, the rights.of the appellant to a reversal of the decision complained of, would be as *232 strong as it is under this license. One half the doubts *n life arise from thé defects of language, and if this instrument had been called an exempnon instead of a license, it would have giyen a better idea of its character. Licensing acts, in fact, in legislation, are universally restraining acts; as, for example, acts licensing gaming houses, retailers of spiritous' liquors, &c. The act, in this instance, is distinctly of that character, and forms part of an extensive system, the object of which is to encourage American shipping, and place them on an equal footing with the shipping of other nations. Almost every commercial nation reserves to its. own subjects a monopoly of its coasting trade; and a countervailing privilege in favour of American shipping is contemplated, in the whole legislation of the United States on this subject. It is not to give the vessel an American character, that the license is granted; that effect has been correctly attributed to the act of her enrolment. But it is to confer on her American privileges, as contradistinguished from foreign; and to preserve the government from fraud by foreigners, in surreptitiously intruding themselves into the American commercial marine, as well as frauds upon the revenue in the trade coastwise, that this whole system is projected. Many duties and formalities are necessarily imposed upon the American foreign commerce, which would be burdensome in the active coasting trade of the States, and can be dispensed with. A higher rate of tonnage also is imposed, and this license entitles the vessels that take it, to those exemptions, but to nothing more. *233 A common register, equally entitles vessels to carry on the coasting trade, although it does not exempt them from the forms of foreign commerce, or from compliance with the 16th and 17th sections of the enrolling act. And even a foreign vessel may be employed coastwise, upon complying with the requisitions of the 24th section. I consider the license, therefore, as nothing more than what it purports to be, according to the 1st section of this act, conferring on the licensed vessel certain privileges in that trade, not conferred on other vessels; but the abstract right of commercial intercourse, stripped of thr.s« privileges, is common to all.
Yet there is one view, in which the license may he allowed considerable influence in sustaining the decision of this Court.
It has been contended, that the grants of power to the United States over any subject, do not, necessarily, paralyze the arm of- the States, or deprive them of the capacity to act on the same subject. That this can be the effect only .of prohibitory provisions in their own constitutions, or in that of the general government. The vis vites, of power is still existing in the States, if not extinguished by the constitution of the United States. That, although as to all those grants of power which may be called aboriginal, with relation to the government, brought into existence by the constitution, they, of course, are out of the reach of State power; yet, as to all concessions of powers which previously existed in the» States, it was otherwise. The practice of our government cer-
*234 tainly has been, on many subjects, to odcupy so much only of the field opened to them, as they think the public interests require. Witness the jurisdiction of the Circuit Courts', limited both as to cases and «s to amount; and various other instances that might be cited, feut the license furnishes a full answer to this objection; for, although one grant of power over commerce, should not be deemed a total relinquishment of power over the subject, but amounting only to a power to assume, still the power of the States must be at an end, so far as the United States have, by their legislative act, taken the subject under their immediate superintendence. So far as relates to the commerce coastwise, the act under which this license is granted, contains a full expression, of Congress on this subject. Vessels, from five tons upwards, carrying on the coasting trade, are made the subject of regulation by that act. And this license proves, that this vessel has complied with that act, and been regularly ingrafted into one class , of the commercial marine of the country.
It remains, to consider the objections- to this opinion, as presented by the counsel for the appel-lee. On those which had relation to the particular character of this boat, whether as a steam boat or a ferry boat, I have only to remark, that in both those characters, she is expressjy recognised as an object of the provisions which relate to licenses.
The 12th section of the act of 1793, has these words: “That when the master of any ship or vessel, ferry boats excepted, shall be changed,” &c< And the act which exempts licensed steam *235 ,bo¿ts from the provisions against alien interests, shows such sboats to be both objects of the been-sing act, and objects of that act, when employed exclusively within our bays and rivers.
But the principal objections to these opinions arise, 1st. From the unavoidable action of some of the municipal powers of the States, upon commercial subjects.
2d. From passages in the constitution, which are supposed to imply a concurrent power in the States in regulating commerce. '
It is no objection to the existence of distinct, substantive powers, that, in their, application, they bear upon the same subject. The same bale of goods, the samé cask of provisions, or the same ship, that may be the subject of commercial regulation, may also be the vehicle of disease. .And the health lav/s that require them to be stopped . and ventilated, are no more intended as regulations on commerce, than the Jaws which permit their importation, are intended to. innoculate the community with disease.- Their different purposes mark the distinction between the powers brought into action; and while frankly exercised, they can produce no serious collision. As to laws affecting ferries, turnpike roads, and other subjects of the same class, so far from meriting the epithet of commercial regulations, they are, in fact, commercial facilities, for which, by the consent of mankind, a compensation is paid, upon the same principle that the whole commercial world submit to pay light money to the Danes. Inspection laws are of a more equivocal nature, and it is obvious, that *236 the constitution has viewed that subject 'with much solicitude. But so far from sustaining an inference in favour of the power of the States over commerce, I cannot but. think that the guarded provisions of the 10th section, on this'subject, furnish a strong argument against that inference.. It was obvious, that inspection laws must combine muni-j cipal with commercial regulations ; and, while the power over the subject is yielded to the .States, for obvious reasons, an absolute control is given over State legislation on the subject, as far as that legislation may be exercised, so as to affect the commerce of the country. The inferences, to bé correctly drawn, from this whole article, appear to me to be altogether in favour of the exclusive grants to Congress of power over commerce, and the reverse of that which the appellee contends for.
Tiiis section contains the positive restrictions imposed by the constitution upon State power. The first clause of it, specifies those powers which the States are precluded from exercising, even though the Congress were to permit them. The second, those which the States may exercise with the consent of Congress. And here the sedulous attention to the subject of State exclusion* from commercial power, is strongly marked. Not satisfied with the express grant to the United States of the power over commerce, this clause negatives the exercise of that power to the States, as to the only two objects which could ever tempt them, to assume the exercise of that power,‘to wit, the collection of a revenue from imposts and duties on imports and exports; or from a tonnage, duty. As *237 to imposts on imports or exports, sucha revenue might have been aimed at directly, by express legislation, or indirectly, in the form of inspection laws ; and it became necessary to guard against both. Hence, first, the consent of Congress to such imposts or duties, is made necessary; and as to inspection laws, it is limited to the minimum of expenses. Then, the money so raised shall be paid into the treasury of the United States, or may be sued for. since it is declared to be for their use.
And lastly, all such laws may be modified, ór repealed, by an act of Congress. It is impossible for a right to be more guarded. As to a tonnage duty, that could be recovered in but one way \ and a sum so raised, being obviously necessary for the execution of health laws, and other unavoidable port expenses, it was intended that it should go into the State treasuries ; and nothing more was required, therefore, than the consent of Congress. But this whole clause, as to these two subjects, appears to have been introduced ex abiindanii cautela, to remove every temptation to an attempt to-interfere with the powers of Congress over commerce, and to show how far Congress might consent to permit the States to exercise that power. Beyond those limits, even by the consent of Congress, they could not exercise it. And thus, we have the whole effect of the clause. The inference which counsel would deduce from it, is neither necessary nor consistent with the general purpose of the clause.
But instances have been insisted on, with much confidence, in argument, in which, by municipal *238 laws, particular regulations respecting their cargoes have been imposed upon shipping in the ports of the United States ; and one, in which forfeiture was made the penalty of disobedience.
Until such laws have been tested by exceptions to their constitutionality, the argument certainly wants much of the force attributed to it; but admitting their constitutionality, they present only the familiar case of punishment inflicted by both governments upon the same individual. He who robs the mail, may also steal the horse that carries it, and would, unquestionably, be subject to punishment, at the same time, under the laws of the State in which the crime is committed, and under those of the United States. And these punishments may interfere, and one render it impossible to inflict the other, and yet the two governments would be acting under powers that have no claim to identity.
It would be in vain to deny the possibility of a clashing and collision between the measures of the two governments. The line cannot be drawn with sufficient distinctness between the municipal powers of the one, and the commercial powers of the other. In some points they meet and blend so as scarcely to admit of separation. Hitherto the only remedy has been applied which the case admits of; that of a frank and candid co-operation for the general good. Witness the laws of Congress requiring its officers to respect the inspection laws of the States, and to aid in enforcing their health laws; that which surrenders to the States the superintendence of pilotage, and the *239 many laws passed to permit a tonnage duty to be levied for the use of their ports. Other instances could be cited, abundantly, to prove that collision must be.sought to be produced; and when it does arise, the question must be decided how far the powers of Congress are adequate to put it down. Wherever the powers of the respective governments are frankly exercised, with a distinct view to the ends of such powers, they may act upon the same object, or use the same means, and yet the powers be kept perfectly distinct. A resort to the same means, therefore, is no argument to prove the identity of their respective powers.
I.have not touched upon the right of the States to grant patents for inventions or improvements, generally, because.it does not necessarily arise in this cause.. It is enough for all the purposes of this decision, if they cannot exercise it so as to restrain a free intercourse among the States.
Decree. This cause came on to be heard on • the transcript of the record of the Court for the Trial of Impeachments and Correction of Errors of the State of New-York, and was argued by counsel. On .consideration whereof, this Court is of opinion, that the several licenses to the steam boats the Stoudinger and the Rellona, to carry on the coasting trade, which are set up by the appellant, Thomas Gibbons, in his answer to the bill of /he respondent, Aaron Ogden, filed in the Court of Chancery for the State of New-York, which were granted under an act of Congress; passed in pursuance of the constitution of the *240 United States; gave full authority to those vessels to navigate the waters of the United States, by steam or otherwise, for the purpose of carrying on the coasting trade, any law of the State of New-York to the contrary notwithstanding; and that so much of the several laws of the State of New-York, as prohibits vessels, licensed according to the laws of the United States, from navigating the waters of the State'of New-York, by means of fire or steam, is repugnant to the said constitution, and void. This Court is, therefore, of opinion, that the decree of the Court of New-York for the Trial of Impeachments and the Correction, of Errors, affirming the. decree of the Chancellor of that State, whieh perpetually enjoins the said Thomas;Gibbons, the appellant, from navigating the waters of the State of New-. York with the steam boats the Stoudinger and the Bellona, by steam or fire, is erroneous, and ought tobe reversed, and. the same is hereby reversed and annulled: and this Court doth further direct; order, and decree, that the bill of the said Aaron Ogden be dismissed, and the. same is hereby dismissed accordingly.

 2 U. S. L. p. 345. 3 U. S. L. p. 126.

 3 U. S. L. p. 529.

 Dr. Witherspoon.

 January 21,1786.

 United States v. Bevans, 3 Wheat. Rep. 336.

 p. 321.

 3 U.S.L. p. 366. c. 193. s. 3.